USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _7/10/2023_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

THE CITY OF NEW YORK and THE BOARD       :
OF EDUCATION OF THE CITY SCHOOL          :
DISTRICT OF THE CITY OF NEW YORK,        :
                                         :
                            Plaintiffs,  :        22-CV-2248 (VEC)
                                         :
          -against-                      :        OPINION AND ORDER
                                         :
                                         :
PHILADELPHIA INDEMNITY INSURANCE         :
COMPANY,                                 :
                                         :
                            Defendant.   :

------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

Plaintiffs The City of New York (the "City") and The Board of Education of the City

School District of the City of New York (the "Board") (collectively, the "City")[1] sued

Philadelphia Indemnity Insurance Company ("PIIC") for declaratory judgment and attorneys'

fees and expenses pursuant to two separate insurance policies between PIIC and non-profit

human services agencies.  *See* Am. Compl., Dkt. 14; Pl. Mem. at 1, Dkt. 32.  The City alleges

that PIIC has a duty to defend it in two civil tort actions: *Tucker v. City of New York et al.*, Index

No. 160960/2018 (Sup. Ct. N.Y. Cnty.) (the "*Tucker* Action") and *S.M. v. City of New York, et*

*al.*, 1:20-cv-05164 (JPO) (S.D.N.Y.) (the "*S.M.* Action").[2]  Pl. Mem. at 1–2.  PIIC argues that it

---

[1]      The Board joins this action with respect to the First and Second Causes of Action only; those claims
concern the underlying case of *Tucker v. City of New York et al.*, Index No. 160960/2018. *See* Pl. Mem. at 1 n.2.
For ease of reference, the Court refers to Plaintiffs collectively as the "City" throughout this Opinion & Order; but
only when discussing the *Tucker* Action shall references to the "City" include both the City and the Board.

[2]      Plaintiffs' Amended Complaint sought declaratory judgment and indemnification with respect to four tort
actions. *See* Am. Compl. ¶¶ 30–68, 100–117.  At some point during the parties' briefing of their cross-motions for
summary judgment, PIIC agreed to defend Plaintiffs in two of those cases. *See* Pl. Mem. at 1 n.1; Def. Mem. at 1,
Dkt. 38; Pl. Reply at 1 nn.2–3, Dkt. 40.  Accordingly, Plaintiffs' Third through Sixth causes of action against PIIC
are dismissed as moot.

has no duty to defend the City in the civil actions because the insurance policies at issue do not extend coverage beyond the non-profit entities that are the named insureds.  *See* Answer and Counterclaim, Dkt. 20; Def. Mem. at 1, Dkt. 38.  The parties have cross-moved for summary judgment pursuant to Federal Rule of Civil Procedure 56.

For the following reasons, Plaintiffs' motion for summary judgment is GRANTED; and PIIC's motion for summary judgment is DENIED.

## BACKGROUND[3]

The Young Men's Christian Association of Greater New York (the "YMCA") and Good Shepherd Services ("Good Shepherd") are non-profit agencies that contracted with the City (and, in the case of the YMCA, the Board) to provide various services.  56.1 Stmt.[4] ¶¶ 4, 37, Dkt. 39; *see* Pl. Mem. at 1–2.  The YMCA provides educational programs and services to New York City elementary school students.  *See* 56.1 Stmt. ¶ 4.  Good Shepherd provides foster care and housing for New York City children.  *See id.* ¶ 37.  Each agency's contract with the City requires the agency "to obtain a commercial general liability ["CGL"] insurance policy . . . with coverage at least as broad as the insuring agreement in the most recently issued Insurance Services Office Form ["ISO"] CG 00 01."[5]  56.1 Stmt. ¶¶ 5, 38; Pl. 56.1 Stmt., Ex. A, Dkt. 30-1; *see also* Proshansky Decl., Ex. A, Dkt. 41.  Each contract also required the agency to include the City (and the Board, in the case of the YMCA contract) as an "additional insured" under its CGL policy and that "such coverage" be at least as broad as that provided in the most recently issued

---

[3]    All facts are undisputed unless otherwise stated.

[4]    References to the Rule 56.1 Statement are to the version containing PIIC's responses to Plaintiffs' 56.1 Statement at docket entry 39 unless otherwise stated.

[5]    References to Insurance Services Office ("ISO") coverage forms, particularly coverage forms "CG 00 01" and "CG 20 10" are to "generic forms that are produced by the [insurance] industry that define the breadth and depth of coverage."  *See* Def. Reply at 2, Dkt. 42.

ISO Form CG 20 10 or CG 20 26.[6]  *See* 56.1 Stmt. ¶¶ 6, 38; *see also* Pl. 56.1 Stmt., Ex. A.  Both the YMCA and Good Shepherd purchased CGL insurance from PIIC.  56.1 Stmt. ¶¶ 7, 39.

The YMCA purchased a Commercial Lines Policy from PIIC effective from April 1, 2017 through April 1, 2018 (the "YMCA Policy").  *Id.* ¶ 7.[7]  The YMCA Policy jacket, titled "Commercial Lines Policy," states that the Policy consists of "One or More Coverage Parts," and that a "Coverage Part" consists of "one or more coverage forms" and "applicable forms and endorsements."  *Id.* ¶ 8; *see also* Ex. 1 at 6, Dkt. 39-1.[8]

Good Shepherd also purchased a "Commercial Lines Policy" from PIIC effective from December 1, 2018 through September 1, 2019 (the "Good Shepherd Policy").  56.1 Stmt. ¶ 39.[9]  Like the YMCA Policy, the Good Shepherd Policy has a policy jacket that states that the "policy consists of" declarations, common policy conditions, and one or more coverage parts, and that each "Coverage Part" consists of "one or more coverage forms" and "applicable forms and endorsements."  *Id.* ¶ 41; *see also id.*, Ex. 2 at 6, Dkt. 39-2.[10]

[6]     The YMCA contract required the agency to include the City and the Board as Additional Insureds with coverage at least as broad as that provided in the most recently issued ISO Form CG 20 10 or CG 20 26, Pl. 56.1 Stmt, Ex. A; the Good Shepherd contract apparently only required that the agency include the City as an Additional Insured with coverage at least as broad as ISO Form CG 20 10, *see* 56.1 Stmt. ¶ 38.

[7]     Most, if not all, of PIIC's responses to Plaintiff's 56.1 Statements describing the YMCA Policy only "object[] to the City taking select terms[] off of pages and seeking a stipulation as to completeness and accuracy." *See, e.g.*, 56.1 Stmt. ¶¶ 8–13.

[8]     A complete version of the YMCA Policy is docketed in four parts as Ex. 1 to Defendant's Response to Plaintiffs' 56.1 Statement, Dkt. 39-1 through Dkt. 39-4.  All references to the YMCA Policy will be to the full policy at Ex. 1, which is consecutively paginated.

[9]     Like its responses regarding the YMCA Policy, most, if not all, of PIIC's responses to Plaintiff's 56.1 Statements describing the Good Shepherd Policy only "object[] to the City taking select terms[] off of pages and seeking a stipulation as to completeness and accuracy."  *See, e.g.*, 56.1 Stmt. ¶¶ 39–57.

[10]     A complete version of the Good Shepherd Policy is docketed in 10 parts as Ex. 2 to Defendant's Response to Plaintiffs' 56.1 Statement, Dkt. 39-5 through 39-14.  All references to the Good Shepherd Policy will be to the full policy at Ex. 2, which is consecutively paginated.

## I.     The *Tucker* Action Against the YMCA

On or about December 10, 2018, Jamie Tucker, suing on behalf of himself and his infant

son, J.T., sued the City, the Board, and the YMCA.  56.1 Stmt. ¶ 27; *see also* Pl. 56.1 Stmt., Ex.

C, Dkt. 30-3.  Tucker alleged that a YMCA employee sexually abused J.T. and that the "YMCA

and/or City employees at P.S. 57 negligently failed to take action" despite knowing of the abuse.

56.1 Stmt. ¶ 29.  The *Tucker* Complaint asserts claims for negligence and intentional infliction of

emotional distress.  *See id.* ¶ 30; Pl. 56.1 Stmt., Ex. C ¶¶ 48–91.

By letter dated March 22, 2019, the City tendered its defense of *Tucker* to PIIC.  56.1

Stmt. ¶ 31.  PIIC disclaimed coverage on the grounds that: (1) the City is only an additional

insured on the CGL and the Professional Liability Coverage forms, for which the "Abuse and

Molestation Exclusion operates to preclude coverage;" (2) the City is not an additional insured

under the "Sexual and Physical Abuse and Molestation Vicarious Liability Coverage Form,"

which is the "applicable coverage form" for the claims in *Tucker*; and (3) the Board is not an

additional insured on the CGL Policy; and even if it were, the same Abuse and Molestation

Exclusion would preclude coverage for the Board.  *See id.* ¶ 32; *see also* Pl. 56.1 Stmt., Ex. D at

15–16, Dkt. 30-4.

## II.     The *S.M.* Action Against Good Shepherd

On or about July 6, 2020, Alison King, as next friend of S.M., sued the City and Good

Shepherd, alleging that S.M. suffered verbal abuse and was forced to stay at a lockdown

residential facility without her consent for five months.  56.1 Stmt. ¶¶ 58, 59.  S.M. alleges a

substantive due process violation, as well as related state-law violations, for keeping S.M. in a

lockdown facility "with no set end date," disrupting her access to educational services, and for

failing to protect her from "repeated bullying and psychological harm at the facility."  *See* Pl.

56.1 Stmt., Ex. G ¶ 73, Dkt. 30-6.  S.M. alleges that the City is liable because it "assumes the

4

risks incidental to the maintenance of the [Administration for Children's Services] and its employment of attorneys, caseworks, and others."  *See id.* ¶ 9.

By letter dated July 16, 2020, the City tendered the defense of *S.M.* to PIIC.  56.1 Stmt. ¶ 60.  PIIC disclaimed coverage and declined to defend the City, asserting that: (1) the claim fell under the Sexual and Physical Abuse and Molestation ("SPAM") Vicarious Liability Coverage, for which the City is not an additional insured; and further, that (2) the even if the claim fell under the CGL Coverage Part — as to which the City is an Additional Insured — that part is subject to an Abuse and Molestation Exclusion.  *See* 56.1 Stmt. ¶ 61; *see also* Pl. 56.1 Stmt., Ex. H at 2–3, Dkt. 30-7.

## DISCUSSION

### I.   Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).  To defeat summary judgment, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial."  *Sista v. CDC IXIS N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (quoting Fed. R. Civ. P. 56(e)).  Courts "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) (per curiam) (citation omitted).

## II.     The Applicable Law

Under New York law,[11] "[i]nsurance policies are, in essence, creatures of contract, and accordingly, subject to principles of contract interpretation."  *In re Estates of Covert*, 97 N.Y.2d 68, 76 (2001); *see also Lepore v. Hartford Fire Ins. Co.*, 374 F. Supp. 3d 334, 343 (S.D.N.Y. 2019).  The interpretation of a contract "is a matter of law for the court to decide."  *Int'l Multifoods Corp. v. Com. Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002).  As the Second Circuit has explained:

> In determining a motion for summary judgment involving the construction of contractual language, a court should accord that language its plain meaning giving due consideration to the surrounding circumstances and apparent purpose which the parties sought to accomplish.  Where contractual language is ambiguous and subject to varying reasonable interpretations, intent becomes an issue of fact and summary judgment is inappropriate.  The mere assertion of an ambiguity does not suffice to make an issue of fact.  Ambiguity resides in a writing when — after it is viewed objectively — more than one meaning may reasonably be ascribed to the language used.  Only where the language is unambiguous may the district court construe it as a matter of law and grant summary judgment accordingly.

*Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 187 (2d Cir. 2006) (quoting *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir. 1990)).  Any ambiguity in an insurance contract is construed against the insurer.  *Ment Bros. Iron Works Co. v. Interstate Fire & Cas. Co.*, 702 F.3d 118, 124 (2d Cir. 2012) (citing *Belt Painting Corp. v. TIG Ins. Co.*, 100 N.Y.2d 377, 383 (2003)).

An insurer has a duty to defend its insured against a third party's claims "whenever the allegations in [the third party's] complaint state a cause of action that gives rise to the reasonable possibility of recovery under the policy."  *Fieldston Prop. Owners Ass'n, Inc. v. Hermitage Ins. Co.*, 16 N.Y.3d 257, 264 (2011).  "[W]hatever may later prove to be the limits of the insurer's

---

[11]     The parties agree that New York law governs this case.

6

responsibility to pay," *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 620 (2d Cir.

2001), the insurer has a duty to defend against claims if there is any "possible factual or legal

basis on which the insurer might eventually be held to be obligated to indemnify the insured,"

*Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 115 (2d Cir. 2005) (alterations omitted); *see also*

*Century 21, Inc. v. Diamond State Ins. Co.*, 442 F.3d 79, 82 (2d Cir. 2006); *Auto. Ins. Co. of*

*Hartford v. Cook*, 7 N.Y.3d 131, 137 (2006).   In other words, the duty to defend is broader than

the duty to indemnify: the duty to indemnify arises only when a third party's claim *actually* lies

within a policy's coverage, but the duty to defend arises so long as the action could *potentially*

give rise to a covered claim.  *See Century 21*, 442 F.3d at 82; *Fieldston*, 16 N.Y.3d at 264–65;

*Allianz*, 416 F.3d at 115.

        Pursuant to the so-called "entire action" rule, an insurer has a duty to defend against

actions that contain both covered and non-covered allegations.  *See Fieldston*, 16 N.Y.3d at 264–

65.  Consistent with this rule, if any claims in the underlying litigation are arguably or potentially

covered, "the insurer is required to defend the entire action," including both the arguably covered

claims and the claims that are indisputably not covered.  *Id.* (citing *Town of Massena v.*

*Healthcare Underwriters Mut. Ins. Co.*, 98 N.Y.2d 435, 443 (2002); *Frontier Insulation*

*Contractors v. Merchs. Mut. Ins. Co.*, 91 N.Y.2d 169, 175 (1997)); *see also High Point Design,*

*LLC v. LM Ins. Corp.*, 911 F.3d 89, 95 (2d Cir. 2018).

        In determining whether there is a duty to defend, a court must compare the terms of the

insurance policy to the allegations in the underlying litigation.  *See Century 21*, 442 F.3d at 83;

*Cook*, 7 N.Y.3d at 137.  To do so, the court may consider materials filed in the underlying

litigation, including "the allegations within the four corners of the underlying complaint,"

*Allianz*, 416 F.3d at 115, and "formal submissions" on the case's docket sheet, such as

responsive pleadings and discovery reports, *Northville Indus. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 89 N.Y.2d 621, 635 (1997); *see also, e.g.*, *High Point*, 911 F.3d at 95.  The court may also consider any other facts within the knowledge of the insurer.  *See Allianz*, 416 F.3d at 115 (citing *Frontier*, 91 N.Y.2d at 175); *Fitzpatrick v. Am. Honda Motor Co.*, 78 N.Y.2d 61, 67–69 (1991).[12]  "[T]he analysis depends on the facts which are pleaded" in the litigation, not on "conclusory assertions" in the complaint or other documents.  *Allstate Ins. Co. v. Mugavero*, 79 N.Y.2d 153, 162 (1992).

The policyholder bears the initial burden of showing that the insurance policy covers the claims at issue.  *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 276 (2d Cir. 2000).  Once that burden is met, the burden shifts to the insurer to show that an exclusion to the policy applies.  *Ment Bros.*, 702 F.3d at 121.  If the insurer establishes the applicability of an exclusion, the burden shifts back to the policyholder to show that an exception to the exclusion applies and, therefore, that the disputed claims are covered.  *Id.* at 121–22.

"[A]n insurer who relies upon an exclusion in order to be relieved of its duty to defend and thus defeat an insured's motion for summary judgment must demonstrate 'that the allegations of the complaint cast that pleading solely and entirely within the policy exclusions, and, further, that the allegations, *in toto,* are subject to no other interpretation.'"  *City of New York v. Salvation Army*, 881 N.Y.S.2d 362 (Sup. Ct. N.Y. Cnty. 2009) (citing *Int'l Paper Co. v. Cont'l Cas. Co.*, 35 N.Y.2d 322, 325 (1974)).

---

[12]    New York, like a majority of jurisdictions, allows courts to look beyond the four corners of the complaint in the underlying litigation to determine whether there is a duty to defend.  *See High Point*, 911 F.3d at 95 (citing *Fitzpatrick*, 78 N.Y.2d at 68).

### III.    The YMCA Policy Covers the City and the Board

### A.    The Policy

### 1.    Policy Declarations and Form Schedules

As is relevant here, the YMCA Policy begins with a Common Policy Declarations Page,[13] which lists the various Coverage Parts that are included in the Policy and identifies "the YMCA of Greater New York" as the Named Insured.  56.1 Stmt. ¶ 9; *see also* Def. Mem. at 5. The Common Policy Declarations page states that the Policy "consists of the following coverage parts for which a premium is indicated": a "Commercial Property Coverage Part"; a "Commercial General Liability Coverage Part"; a "Commercial Crime Coverage Part"; and a "Commercial Auto Coverage Part."  *See* 56.1 Stmt. ¶¶ 9–10; Ex. 1 at 10.  The remaining coverages listed on the Declarations Page also include a premium, although they do not include the term "Coverage Part" in their title: "Employee Benefits"; "Professional Liability"; and "Sexual/Physical Abuse."  56.1 Stmt. ¶ 11.[14]

Each Coverage Part contains its own declarations page that indicates, *inter alia*, the policy period or effective date, the insurance limits of that coverage, and a reference to a "Forms Schedule."  *See* Def. Mem. at 4–5; Pl. Reply at 4–5.  Each "Form Schedule" contains a list of the "Forms and Endorsements"[15] that apply to that particular "Coverage Part and [are] made a part

---

[13]    A common policy declarations page is a separate section of an insurance policy that contains basic details about the policy and summarizes key information, including the name of the policyholder, a list of the coverages provided, and the premium amounts.  *See* 1 New Appleman on Insurance Law Library Edition § 1.07[3] (2023).

[14]    Although the premium amounts listed on the Common Declarations page are redacted, the parties do not dispute that all of the Coverage Parts include a premium.

[15]    An endorsement, also known as a "rider, is a change to [the] insurance policy that adjusts [the] coverage." Pl. Reply at 4 n.7.  It is common for an endorsement to be used in cases where an insured "choose[s] to purchase an optional coverage to broaden [its] insurance protection."  *Id.*  "Endorsements enable an insurer to tailor a standardized [coverage] form to the particular needs or specifications of the insured."  1 New Appleman on Insurance Law Library Edition § 1.07[8] (2023).

of this [P]olicy at time of issue." *See* 56.1 Stmt. ¶ 14; *see also, e.g.*, Ex. 1 at 42.  The Policy

includes seven "Form Schedules" that generally coincide with the seven Coverage Parts listed on

the Common Policy Declarations Page: "Policy"; "Property"; "General Liability"; "Commercial

Auto"; "Employee Benefits"; "Professional Liability"; and "Sexual or Physical Abuse or

Molestation."  *See* 56.1 Stmt. ¶ 13; Ex. 1 at 10; *see also* Def. Mem. at 5.

Accordingly, the Policy's CGL Coverage Part has its own declarations page (the "CGL

Declarations Page").  *See* 56.1 Stmt. ¶ 15.  The CGL Declarations Page states the insurance

limits and premiums for the CGL Coverage Part and refers the policyholder to the CGL Forms

Schedule for the applicable modifications and forms.  *See id.*; Ex. 1 at 41.  Immediately

following the CGL Declarations Page is the General Liability Form Schedule.  56.1 Stmt. ¶ 17.

The General Liability Form Schedule lists approximately 35 "Forms and Endorsements applying

to this Coverage Part;" as is relevant here, the "Forms and Endorsements applying to" the CGL

coverage include the CGL Declarations Page, the CGL Coverage Form, a "Blanket Additional

Insured Provision," an "Abuse or Molestation Exclusion," and three "Sexual or Physical Abuse"

("SPAM") forms.  *See id.* ¶¶ 18–23; Ex. 1 at 42.  The three SPAM forms are a "Declarations –

Manuscript," a "Coverage Form – SAMSIR,"[16] and a "Self Insured Retention" form.  Ex. 1 at

42.

### 2.    The CGL Coverage Form

The CGL Coverage Form is a 16-page "CG 00 01" form that sets forth "rights, duties

and what is and what is not covered."  *See id.* at 142.  Section I of the CGL Coverage Form,

titled "Coverages," provides for two coverage types: "Coverage A – Bodily Injury and Property

Damage Liability," and "Coverage B – Personal and Advertising Injury Liability."  *See id.* at

---

[16]    SAMSIR is an acronym for "Sexual Abuse Molestation Self Insured Retention."

142, 147.  Under the Insuring Agreement for Coverage A, PIIC has "the right and duty to defend the insured against any 'suit' seeking" damages for "'bodily injury' or 'property damage' to which this insurance applies."  *See id.* at 142.  The CGL Coverage Form defines bodily injury as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time."  *Id.* at 154.

Section II of the CGL Coverage Form, titled "Who Is An Insured," provides, in relevant part, that the YMCA, its officers, directors, employees, and shareholders are insureds.  *Id.* at 150.  The term "you" refers to "the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy."  *Id.* at 142.  As described above, the Common Policy Declarations lists the Named Insured as the YMCA.  *See id.* at 10.

### 3.      The Abuse or Molestation Exclusion Endorsement

The Abuse or Molestation Exclusion (the "Abuse Exclusion") is a one-page endorsement bearing the ISO Form label "CG 21 46."  *See* Ex. 1 at 164.  It states that it "modifies insurance provided under the [CGL] Coverage Part" by, in relevant part, excluding coverage for "bodily injury" that "aris[es] out of:

1. The actual or threatened abuse or molestation by anyone of any person while in the care, custody or control of any insured, or
2. The negligent:
    a. Employment;
    b. Investigation;
    c. Supervision;
    d. Reporting to the proper authorities, or failure to so report; or
    e. Retention;

of a person for whom any insured is or ever was legally responsible and whose conduct would be excluded by Paragraph 1 above.

*Id.* at 164; 56.1 Stmt. ¶ 19.

### 4.      The SPAM-Related Forms and Endorsements

The General Liability Form Schedule lists three separate SPAM-related forms: "Sexual or Physical Abuse Declarations – Manuscript," "Sexual or Physical Abuse Coverage Form – SAMSIR," and "Sexual or Physical Abuse Coverage Self Insured Retention." Ex. 1 at 42. Other portions of the Policy that are not listed in the General Liability Form Schedule also reference SPAM coverage; the Court will describe each reference to SPAM coverage in the order in which it appears in the Policy.

The first SPAM-related form to appear in the Policy is the "Form Schedule – Sexual or Physical Abuse or Molestation." *See id.* at 86. The SPAM Form Schedule, which is not included in the General Liability Form Schedule, lists a single form as applying to that Coverage Part; the form, titled "Binding Arbitration," is nowhere to be found in the Policy. *See* 56.1 Stmt. ¶ 23; Ex. 1 at 86; *see also* Pl. Mem. at 19. The second SPAM-related document, an Endorsement entitled "Sexual or Physical Abuse Declarations – Manuscript," appears to be a cover page because, other than the title, it is otherwise blank in all material respects. *See* Ex. 1 at 193; 56.1 Stmt. ¶ 20(a). Immediately following the cover page is a "Policy Declarations Page" for the SPAM "Vicarious Liability Coverage Form Excess of Self Insured Retention" (hereinafter the "SPAM Declarations Page"). *See* Ex. 1 at 194; 56.1 Stmt. ¶ 20(a). The SPAM Declarations Page provides the insurance limits for each occurrence, an aggregate limit, and the self-insured retention amount. *See* Ex. 1 at 194. At the bottom of the page, in smaller print, it states: "These declarations are part of the policy declarations containing the name of the insured and the policy period." *Id.*

The following page states: "This Endorsement Changes the Policy," with the heading "Sexual or Physical Abuse Coverage Form – SAMSIR." *Id.* at 195. Other than the heading, the page is blank. *Id.*; *see also* Pl. Reply at 7 n.11. It is immediately followed by the SPAM

"Vicarious Liability Occurrence Coverage Form Excess of Self Insured Retention," which consists of five pages, each bearing the label "SAMSIR" in small print in the bottom left-hand corner.  *See* Ex. 1 at 196–200 (hereinafter, the "SAMSIR Form").  "Section I – Coverage" of the SAMSIR Form provides that PIIC will "defend any 'suit' seeking 'damages'" in excess of the self-insured retention "if the insured is alleged to be liable for another person's 'abusive conduct'" due to the negligent:

> (a) employment;
> (b) selection;
> (c) investigation;
> (d) supervision;
> (e) reporting to the proper authorities, or failure to so report; or
> (f) retention;
>
> of any "employee", volunteer or any other person or persons for whom the insured is or ever was legally responsible.

*Id.* at 196.  Abusive conduct is defined as "actual, threatened or alleged acts of physical abuse, sexual abuse, sexual molestation or sexual misconduct performed by one person or two or more people acting together."  *Id.* at 199.

Section II of the SAMSIR Form is very similar to the CGL Coverage Form: it is titled "Who is an insured," and, defines an insured as "you" — i.e., the YMCA — and the YMCA's "directors," "employees," "volunteers," and "students in training," for liability arising out of their respective duties.  *See id.* at 197.  The SAMSIR Form also defines "bodily injury" as "bodily injury, sickness or disease including emotional distress or anguish including death resulting therefrom."  *Id.* at 200.

### 5.    The Additional Insured Forms and Endorsements

The CGL Form Schedule includes a Blanket Additional Insured Endorsement (the "Blanket AI Endorsement").  56.1 Stmt. ¶¶ 18, 24.  The Blanket AI Endorsement amends the "General Liability Coverage Part" to "include as an insured any person or organization for whom

you are required to add as an additional insured to this policy under a written contract, agreement or permit." Ex. 1 at 190, 318; *see also* 56.1 Stmt. ¶ 24.[17]  The Blanket AI Endorsement limits the Additional Insured's coverage to liability arising out of premises the YMCA "own[s], rent[s], lease[s] or occup[ies]; or [the YMCA's] ongoing operations performed for that additional insured as specified in the written contract, agreement or permit." *Id.*

Other documents in the YMCA Policy purport to cover additional insureds by way of later amendments, or "Policy Change Documents," that are not listed on the General Liability Form Schedule.  One such Policy Change Document, as relevant here, indicates that the Policy was "amended" to add two documents: "Form CG 20 10 – Additional Insured – Owners, Lessees or Contractors – Scheduled Person or Organization," and a document identified as "PI-MANU-1 – CG 20 10 Additional Insured Full Name."[18]  *See* Ex. 1 at 315.  The Form CG 20 10 appears on the very next page.  *See id.* at 316 (hereinafter the "Scheduled AI Endorsement").

The Scheduled AI Endorsement amends "Section II – Who Is An Insured" of the CGL Coverage Part to include as an Additional Insured the "organization(s) shown in the Schedule . . . with respect to liability for 'bodily injury,' 'property damage' or 'personal and advertising injury' caused" by the "acts or omissions" of the YMCA, or of those acting on its behalf, "in the performance of [the YMCA's] ongoing operations." *Id.* at 316.  "If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which [the YMCA is] required by the contract or agreement to provide." *Id.*  The "Schedule" lists "The City of New York" as an "Additional

---

[17]     For unexplained reasons, the Blanket AI Endorsement appears twice in the YMCA Policy: at pages 190 and 318.  *See* 56.1 Stmt. ¶ 24; *compare* Ex. 1 at 190, *with id.* at 318.  Both endorsements appear to be identical: each bears the Form number "PI-MANU-1", which matches the form description on the CGL Form Schedule.  *See* Ex. 1 at 42.

[18]     The Policy Change Document appears fourth in the series of such documents, but it indicates that it is "Revision #3" near the top of the page.  Ex. 1 at 315.

Insured Organization" and directs the policyholder to "[s]ee manuscript for full name." *Id.* The

"PI-MANU-1" form lists "The City of New York, and the Department of Education of the City

School District of the City of New York . . . including their officials and employees" as

Additional Insureds. *Id.* at 328; *see also* 56.1 Stmt. ¶ 26.

### B.      The City and the Board Are Additional Insureds

The parties agree that the City's contract with the YMCA required the YMCA to obtain

an insurance policy that covered the City and the Board as Additional Insureds and that the

required coverage was to be as broad as the latest ISO Form CG 00 01.  *See* 56.1 Stmt. ¶¶ 5–6.

There is no apparent dispute that the City and the Board are Additional Insureds under the CGL

Coverage Part, *see* Pl. Mem. at 20; Def. Mem. at 2–3, 15,[19] and that PIIC is defending the

YMCA in the *Tucker* Action, 56.1 Stmt. ¶ 34.  PIIC argues, however, that its duty to defend

arises only from the SPAM Coverage, which, PIIC asserts, is separate from the CGL Coverage

Part and does not include the City as an additional insured.  *See* Def. Mem. at 3–8.  Because the

City/YMCA Contract only requires CGL coverage, PIIC argues, the City is not an Additional

Insured for purposes of SPAM coverage.  *Id.* at 3.  Finally, PIIC argues that, even if the *Tucker*

Action fell within the CGL Coverage Part, that Part's Abuse and Molestation exclusion would

preclude coverage.  *Id.* at 4.

There is no question that the *Tucker* complaint, which alleges sexual abuse by an

employee of the YMCA, implicates the SPAM coverage provisions within the YMCA Policy.

---

[19]      Although PIIC initially took the position in its disclaimer of coverage that the Board was not an Additional
Insured under the CGL Coverage Part, *see* 56.1 Stmt. ¶¶ 32–33, PIIC has abandoned that claim by failing to argue it.
Even if it had pursued that argument, it would easily fail by virtue of the Scheduled AI Endorsement and the Policy
Change Document, both of which clearly include the City and the Board as Additional Insureds.  *See supra* at
Section III(A)(5).  PIIC has also failed to argue and therefore abandoned the claim that coverage would have
alternatively been precluded by the "Expected Or Intended Injury" clause in the CGL Coverage Part.  *See* Def.
Mem. at 4 (noting that coverage was disclaimed "based on Exclusion a. Expected or Intended Injury" but failing to
argue that the exclusion applies to the *Tucker* Action); *see also* Pl. 56.1 Stmt. Ex. D, Dkt. 30-4.

The question is whether SPAM coverage is "a subdivision of, i.e., within the CGL Coverage Part," as to which the City is an Additional Insured, *see* Pl. Mem. at 15–16, or is separate coverage as to which the City is not an Additional Insured, Def. Mem. at 4.  Although it is a close call, the Court finds that SPAM coverage is included within the CGL Coverage Part.

### 1.     The CGL Coverage Part Includes SPAM Coverage

The City argues that the structure of the YMCA Policy demonstrates that SPAM Coverage falls within the CGL Coverage Part.  In support, the City points first to the Policy jacket, which indicates that "a coverage part consists of" coverage forms and applicable forms and endorsements.  Pl. Mem. at 16.  Each coverage part of the YMCA Policy has its own "form schedule," which lists the forms and endorsements that apply to that coverage part.  *See id.* at 17; *see also supra* at Section III(A)(1).  The form schedule for the CGL Coverage Part, titled "Form Schedule — General Liability," lists the three SPAM-related coverage forms at issue.  *See* Ex. 1 at 42.  Accordingly, the City argues, SPAM coverage falls within the CGL Coverage Part, and the *Tucker* allegations bring the claim within the language of the Additional Insured endorsements.  Pl. Mem. at 15.

PIIC argues that the General Liability Form Schedule is merely "a table of contents of policy forms."  Def. Mem. at 4.  Tables of contents traditionally include page numbers; they also list items in the order in which they appear in the document.  Here, the form schedules do not list any page numbers for any of the forms and endorsements, nor do the forms appear in the Policy in the same sequence as they are listed on the Form Schedule.  *See* Ex. 1 at 42.  As the City correctly points out, the form schedules in the YMCA Policy, including the General Liability Form Schedule, "describ[e] and organiz[e] the substantive structure of the policies in which they appear, designating the forms and endorsements that are made a part of ('apply to') a particular

coverage part."  Pl. Reply at 5; *see also* Pl. Mem. at 16.  The City's characterization makes far

more sense than PIIC's "table-of-contents" explanation.

Further undermining PIIC's argument is the fact that the selection of forms and

endorsements that are listed within each Coverage Part's form schedule bear a clear relationship

to that coverage: for example, the General Liability Form Schedule does not include any forms

or endorsements that would apply to any other Coverage Part, such as the Commercial Auto or

Property Coverage Parts, and vice versa.  *See* Ex. 1 at 76 (Commercial Auto Form Schedule

listing forms titled "Business Auto Schedule," "Auto Medical Payments Coverage," and

"Commercial Automobile Elite Endorsement"); *id.* at 29 (Property Form Schedule listing such

"applicable forms" as a "Water Exclusion" notice, "Commercial Property Conditions," and

"Property Declarations").

A plain reading of the General Liability Form Schedule leads to the conclusion that

including the SPAM-related forms on that schedule was no accident — those forms were

included because the parties intended to include SPAM Coverage within the CGL Coverage Part.

*See* Pl. Mem. at 15–16; *see also Andy Warhol Found. for Visual Arts, Inc. v. Fed. Ins. Co.*, 189

F.3d 208, 215 (2d Cir. 1999) ("[A]n insurance policy, like any contract, must be construed to

effectuate the intent of the parties as derived from the plain meaning of the policy's terms.").

PIIC argues that the SPAM Coverage's declarations page is evidence that it is a

standalone coverage part.  Def. Mem. at 4–5.  To illustrate its point, PIIC does two things.  First,

PIIC compares the SPAM Declarations Page to the Professional Liability Coverage Form

Schedule as evidence that SPAM Coverage is, like Professional Liability Coverage, a standalone

coverage part.  *Id.* at 5 (comparing the Property Liability Form Schedule, "which lists seven

different policy forms, including an additional insured endorsement," with the SPAM

Declarations age, which contains "[n]o such additional insured endorsement").  But if form schedules are mere tables of contents, as PIIC argues, then drawing any substantive comparison to the Property Coverage Form Schedule makes no sense.  PIIC cannot have it both ways: either the Policy's form schedules are indicative of the policy structure or they are not.

PIIC next argues that the SPAM Declarations Page "makes it quite clear" that SPAM Coverage is separate and distinct from CGL Coverage because the SPAM Declarations Page "has a separate policy limit, separate retention, and a separate list of policy forms."  *Id.* at 5–6.  The Court is not convinced.  A declarations page in an insurance policy is not "a complete description of the coverage" provided, but rather an "introductory" statement of "essential terms of the policy in an abbreviated form" that is "subject to refinement and definition in the body of the policy."  *See* NEW APPLEMAN ON INSURANCE LAW LIBRARY EDITION § 1.07[3] (2023).

Even if the SPAM Declarations Page could be read to suggest that SPAM coverage is unmoored from the CGL Coverage Part, PIIC offers little, if any, support for the notion that a particular coverage within a broader Coverage Part cannot provide separate occurrence and retention limits.  *See* Pl. Reply at 7 ("[PIIC] fails to provide any facts to verify that insurance policies do not have different coverage limits for different types of coverage, so that a policy limit for abuse might not be as generous as the limit for other bodily injuries.").  PIIC's argument would be more persuasive if there were a separate Form Schedule for SPAM Coverage, as there is for every other Coverage Part in the Policy.  *See, e.g.*, Ex. 1 at 85 (Professional Liability Form Schedule); *id.* at 29 (Property Form Schedule); *id.* at 76 (Commercial Auto Form Schedule); *id.* at 83 (Employee Benefits Form Schedule).  The only "Form Schedule" related to SPAM coverage, as described *supra* Section III(A)(4), lists only a "Binding Arbitration" form that is nowhere to be found within the YMCA Policy.  *See* Ex. 1 at 86; Pl. Mem. at 19–20 ("SPAM-

related forms are listed in the CGL Form Schedule but are entirely absent from the SPAM Form

Schedule, providing still further evidence that SPAM-related coverage is a subdivision of the

CGL Coverage Part.").[20]

Finally, PIIC argues that the Common Policy Declarations Page, which lists "nine

separate coverage parts," one of which is "Sexual/Physical Abuse," supports its argument that

SPAM coverage is a separate "Coverage Part" within the YMCA Policy.  *See* Def. Mem. at 5.

That argument might be persuasive if it were not for the fact that two of the other "coverage

parts" listed on the Common Declarations Page lack a premium amount; therefore, the Common

Policy Declarations page cannot be a comprehensive list of "coverage parts" of the YMCA

Policy.  *See* 56.1 Stmt. ¶¶ 9–11 (stipulating that only seven of the nine coverage parts on the

Common Policy Declarations Page indicate a premium).  The fact that the Common Policy

Declarations Page lists "coverage parts" that are not actually included in the YMCA Policy,

coupled with the fact that the "Sexual/Physical Abuse" listing does not refer to itself as a

"Coverage Part," Ex. 1 at 10, indicates that the Common Declarations Page is not dispositive of

the policy structure.  *See Int'l Multifoods Corp. v. Com. Union Ins. Co.*, 309 F.3d 76, 85 (2d Cir.

2002) ("Captions are relevant to contract interpretation."); *Mazzaferro v. RLI Ins. Co.*, 50 F.3d

137, 140 (2d Cir. 1995) ("A contract of insurance must be read as a whole, including any

introductory clause or heading, to determine the intent of the parties.") (internal quotations

omitted)).

---

[20]     Perhaps one could consider the page immediately preceding the SAMSIR Form as a placeholder for a form schedule — but that page reads that it is an "Endorsement [that] Changes the Policy," and, other than listing the "Sexual or Physical Abuse Coverage Form — SAMSIR," the page is blank.  Ex. 1 at 195; *see also* Pl. Reply at 7 n.11 (noting that this page "is apparently a cover page" for the "Sexual or Physical Abuse Coverage Self Insured Retention").  Plaintiff's interpretation that it is a "cover page" is persuasive inasmuch as the endorsement is immediately followed by the SAMSIR Form, which describes the SPAM coverage.  *See* Ex. 1 at 196–200; *supra* Section III(A)(4).

Finally, PIIC argues that the SAMSIR Form, which identifies "its own set of insureds, separate and distinct from other coverage parts," would have "amend[ed] the CGL definition of insured . . . [i]f the SPAM policy was meant to be part of the CGL coverage." Def. Mem. at 7–8. That argument is illogical. The CGL Coverage Form's definition of an insured is, just like the SAMSIR Form, limited to the Named Insured. *Compare* Ex. 1 at 150, *with id.* at 197. It is neither the SAMSIR Form nor the CGL Coverage Form that extends coverage to the City; the City's coverage comes from the Additional Insured Endorsements found within the CGL Coverage Part. *See* 56.1 Stmt. ¶¶ 24–26. The Additional Insured Endorsements, which make clear that any claim for bodily injury arising out of the YMCA's "ongoing operations" implicates PIIC's duty to defend the Additional Insureds, *see* Pl. Mem. at 20; Def. Mem. at 3, extend CGL Coverage to the City and the Board.[21]

Given the foregoing, the Court is persuaded that the parties intended for SPAM Coverage to be included in the CGL Coverage Part. That the substantive SPAM-related forms are included in the General Liability Form Schedule and the absence of any persuasive evidence or argument suggesting that it exists separately from the CGL Coverage Part further support this conclusion.

### 2.    The Abuse Exclusion Does Not Apply

PIIC points to the Abuse Exclusion as a basis for declining to defend the City, and, more broadly, for the Court to find that the CGL Coverage Part was not intended to include SPAM coverage. *See* Def. Mem. at 9. Extending General Liability coverage to SPAM-related claims, PIIC argues, would render the Abuse Exclusion a "nullity." *Id.* The Abuse Exclusion, as described *supra*, is located within the CGL Coverage Part and broadly excludes coverage for abuse and molestation claims. *See supra* Section III(A)(3); 56.1 Stmt. ¶ 19. Accordingly, PIIC

---

[21]    There is no dispute that the *Tucker* Action implicates SPAM coverage, nor that the Additional Insured Endorsements extend CGL Coverage to the City and the Board.

argues that a natural reading of the Policy compels the conclusion that SPAM coverage is a standalone policy, separate and apart from the CGL Coverage Part, that provides coverage for sexual abuse claims only to the Named Insured.  *See* Def. Mem. at 8–9.

The SAMSIR Form does not squarely map onto the Abuse Exclusion.  Although SPAM coverage arguably cancels out the Abuse Exclusion insofar as SPAM covers abuse and molestation claims, the SAMSIR Form only applies to instances in which the insured is alleged to be vicariously liable; it further expands coverage beyond "abuse and molestation" claims to include allegations of physical abuse and sexual misconduct.  *Compare* Ex. 1 at 164 (the Abuse Exclusion, which excludes coverage for damages for "bodily injury" resulting from "abuse or molestation by anyone of any person while in the care, custody or control of any insured"), *with id.* at 196, 199–200 (the SAMSIR Form, which provides coverage for "bodily injury" resulting from "abusive conduct," i.e., "physical abuse, sexual abuse, sexual molestation or sexual misconduct," by "another person" "if the insured is alleged to be liable for [such other] person's 'abusive conduct'").[22]  The SAMSIR Form is tailored to cases alleging vicarious liability; thus, SPAM Coverage applies to a narrower set of claims than the set that is otherwise excluded by the Abuse Exclusion, i.e., abuse or molestation "by anyone."  *See* Pl. Mem. at 21–22.  In any event, any ambiguity created by the existence of both SPAM coverage and the Abuse Exclusion must be construed in favor of the City.  *See Ment Bros.*, 702 F.3d at 124.

Moreover, as PIIC recognizes, when interpreting an insurance policy, "a court's primary responsibility is to give effect to the intent of the parties."  Def. Mem. at 17 (citing *Stonewall Ins. Co. v. Nat'l Gypsum Co.*, 1992 WL 163180, at *1 (S.D.N.Y. June 24, 1992), *aff'd as modified*

---

[22]     The Court notes that the Abuse Exclusion appears to be a generic industry form.  *See* Ex. 1 at 164.  The Abuse Exclusion Endorsement bears the form label "CG 21 46," which suggests that it may have been a standard endorsement to the CGL Coverage Part rather than the product of a specifically negotiated insurance agreement. *See id.*; *see also* Def. Mem. at 3–4.

*sub nom. Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178 (2d Cir. 1995)).  The

YMCA was obligated to obtain CGL Coverage that was at least as broad as the ISO Form CG 00

01 and name the City as an Additional Insured on "[s]uch coverage."  *See* Pl. 56.1 Stmt., Ex. A

at Section 7.03(A).  Accordingly, PIIC issued to the YMCA an ISO Form CG 00 01.  *See* Ex. 1

at 142–57.  The Abuse Exclusion, however, is a separate ISO Form that narrows the CGL

Coverage otherwise provided by CG 00 01.  *See id.* at 164.  Without SPAM coverage, the Policy

would provide narrower coverage than the YMCA was obligated to obtain; but there is

absolutely no evidence in the record that the YMCA and PIIC did not intend to provide precisely

the coverage that YMCA was obligated to obtain under its contract with the City.

In short, the Court finds that SPAM coverage falls within the scope of the CGL Coverage

Part.  Because the parties do not dispute that *Tucker* implicates SPAM coverage, and because

PIIC has failed to demonstrate that any policy exclusion applies, the City has met its burden of

demonstrating that there is no genuine dispute of material fact as to PIIC's duty to defend the

City (and the Board).[23]  Accordingly, the Court grants the City's motion for summary judgment

as to the *Tucker* action.

## IV.     The Good Shepherd Policy Covers the City

### A.     The Policy

#### 1.     Policy Declarations and Form Schedule

Like the YMCA Policy, the Good Shepherd Policy has a Common Policy Declarations

Page that lists the various Coverage Parts that are included in the Policy and identifies Good

Shepherd as the "Named Insured."  56.1 Stmt. ¶¶ 39, 42.  The Common Policy Declarations Page

---

[23]     Because the Court finds that SPAM coverage exists within the CGL Coverage Part, thereby providing Additional Insured coverage to the City, it does not reach PIIC's argument, to the extent PIIC advances it, that the CGL Coverage Part also excludes professional services liability, *see* Def. Mem. at 15; the parties do not dispute, and PIIC has maintained from the start, that it is SPAM coverage, not Professional Liability Services Coverage, that is implicated by *Tucker.*

lists the Coverage Parts that comprise the Policy by indicating a premium amount for the following: "Commercial Property Coverage Part"; "Commercial General Liability Coverage Part"; "Commercial Inland Marine Coverage Part"; and "Commercial Auto Coverage Part."  *Id.* ¶ 43; Ex. 2 at 11.  The remaining Coverage Parts that are listed with a corresponding premium amount, but which do not include "Coverage Part" in their title, are: "Employee Benefits"; "Professional Liability"; and "Sexual/Physical Abuse."  56.1 Stmt.  ¶ 44.

Each Coverage Part contains its own declarations page and refers to a "Forms Schedule." Each "Form Schedule" contains a list of the "Forms and Endorsements" that apply to that particular Coverage Part.  *Id.* ¶ 47.  The Policy includes six "Form Schedules": "Policy"; "Property"; "General Liability"; "Inland Marine"; "Commercial Auto"; and "Employee Benefits."  *See id.* ¶ 46.

### 2.     The CGL Coverage and Form Schedule

The Good Shepherd Policy has a General Liability Form Schedule that purports to list the forms and endorsements that apply to the CGL Coverage Part.  *See id.* ¶ 52; Ex. 2 at 61.  The Form Schedule lists, in relevant part, a "New York Changes – Commercial General Liability Cov Form" (hereinafter, the "NY CGL Form"); several "Additional Insured" endorsements; as well as an exclusion for "Professional Liability Coverage" and an "Abuse Or Molestation Exclusion." *See* Ex. 2 at 61.[24]

Section I of the standard ISO CGL Coverage Form, titled "Coverages," provides two types of coverage: "Coverage A – Bodily Injury and Property Damage Liability" and "Coverage

---

[24]     Unlike the YMCA Policy, the Good Shepherd Policy's General Liability Form Schedule does not list a separate form or endorsement for SPAM Coverage.  *Compare* Ex. 1 at 61 *with* Ex. 1 at 42.

B – Personal and Advertising Injury Liability."[25]  *See* Proshansky Decl., Ex. A; *see also* 56.1

Stmt. ¶ 51.  Coverage B states that PIIC has "the right and duty to defend the insured against any

'suit'" for "'personal and advertising injury' caused by an offense arising out of [Good

Shepherd's] business."  Proshansky Decl., Ex. A at 6.  The Form defines personal and

advertising injury as "injury, including consequential 'bodily injury,' arising out of . . . [f]alse

arrest, detention or imprisonment."  *Id.* at 15.[26]

### 3.      The Professional Liability Coverage Exclusion

The Professional Liability Exclusion is a one-page endorsement that modifies the CGL

Coverage Part.  *See* Ex. 2 at 319.  The Professional Liability Exclusion excludes coverage for

"bodily injury" or "personal and advertising injury" arising out of:

> 1.  The rendering or failure to render:
>
>> a.  Medical, surgical, dental, x-ray or nursing service, treatment, advice or
>>     instruction, or the related furnishing of food or beverages;
>> b.  Any health or therapeutic service, treatment, advice or instruction; or
>> c.  Any service, treatment, advice or instruction for the purpose of
>>     appearance or skin enhancement, hair removal or replacement or
>>     personal grooming.
>
> 2.  The furnishing or dispensing of drugs or medical, dental or surgical supplies
>     or appliances;

---

[25]      Although the Good Shepherd Policy appears to be missing the CGL Coverage Form, its absence appears to
be a technicality given the presence of the NY CGL Form, which purports to modify the CGL Coverage.  *See
generally* Ex. 2; *see also* Pl. Mem. at 25 n.10 (assuming the CGL Coverage Form's absence "is a clerical error").
PIIC does not address the issue of the missing CGL Coverage Form and instead argues that the Court should only
consider "the policy that [PIIC] ha[s] submitted to the Court" when determining the breadth of coverage.  Def.
Reply at 2.  PIIC does not dispute, however, the City's characterizations of the definitions and terms within the
standard ISO CG 00 01 Form that the City submitted as a reference point.  *See* Proshansky Decl., Ex. A (attaching a
"true and correct copy of the April 2013 version" of the ISO CG 00 01 form "issued by the Insurance Services
Office, Inc.").  Moreover, case law suggests that a uniform CGL Coverage Form exists that, including its definitions,
is consistent in all material respects with the version provided by the City.  *See* Pl. Mem. at 40–41 (collecting cases
in this Circuit involving insurance disputes that have defined "personal and advertising injury" as, *inter alia*, "false
arrest, detention or imprisonment").  The Court will therefore reference the ISO CG 00 01 standard CGL Form as
provided by the City.

[26]      This definition matches the one provided in the YMCA Policy's CGL Coverage Part.  *See* Ex. 1 at 156.

3. The handling or treatment of dead bodies, including autopsies, organ donation or other procedures; or

4. A "professional incident" as defined herein.

"Professional incident" means any actual or alleged negligent:

    a. act;
    b. error; or
    c. omission

in the actual rendering of professional services to others, including counseling services, in your capacity as a human services organization.  Professional services include the furnishing of food, beverages, medications or appliances in connection therewith.

*Id.*

### 4.    The Abuse or Molestation Exclusion

The Abuse or Molestation Exclusion (the "Abuse Exclusion") is a one-page endorsement bearing the label "PI-SAM-006."  *See* Ex. 2 at 337; 56.1 Stmt. ¶ 53.  It "modifies insurance provided under the [CGL] Coverage Part" by, in relevant part, excluding coverage for "bodily injury" and "personal and advertising injury."  Ex. 2 at 337.  The exclusion applies to "all injury sustained by any person, including emotional distress" that "aris[es] out of or result[s] from the alleged, actual or threatened abuse or molestation by anyone."  *Id.*  It further excludes coverage for "molestation or abuse arising out of [Good Shepherd's] negligence or other wrongdoing with respect to:

1. Hiring, placement, employment, training;
2. Investigation;
3. Supervision;
4. Reporting any molestation or abuse to the proper authorities, or failure to so report; or
5. Retention;

of a person for whom any insured is or ever was legally responsible or for whom any insured may have assumed the liability; and whose conduct would be excluded above.

*Id.*

### 5.        The Blanket Additional Insured Endorsement

The Good Shepherd Policy contains a "Blanket Additional Insured" endorsement titled "Blanket AIN for Contracts" (hereinafter, the "Blanket AIN").  *See* 56.1 Stmt. ¶ 55; Ex. 2 at 320. The Endorsement modifies the General Liability Coverage Part insofar as it extends coverage to an additional party "for whom [Good Shepherd is] required to add as an additional insured. . . under a written contract, agreement or permit."  *Id.*  The insurance provided to the additional insured applies to liability arising from Good Shepherd's "ongoing operations performed for that additional insured as specified in the written contract."  *Id.*

### 6.        The SPAM AI Endorsement

The CGL Form Schedule lists another "additional insured" document labeled "PI-SO-015," *see id.* at 61; that document in the Policy is titled "Additional Insured – Sexual or Physical Abuse or Molestation Vicarious Liability Coverage" (hereinafter, the "SPAM AI Endorsement"), *id.* at 330; 56.1 Stmt. ¶ 54.  The SPAM AI Endorsement modifies the SPAM Vicarious Liability Coverage[27] by including as an Additional Insured "[a]ny government organization or funding source where required by a written contract executed prior to the 'bodily injury' to which this insurance applies."  *See* 56.1 Stmt. ¶ 54; Ex. 2 at 330.  The SPAM AI Endorsement applies to "'damages' because of 'bodily injury' . . . caused in whole or in part, by [Good Shepherd's] acts or omissions or the acts or omissions of those acting on [Good Shepherd's] behalf."  *Id.*  It

---

[27]     The SPAM Coverage Form appears at page 448 of the Policy; it is not listed on the General Liability Form Schedule.

further specifies that the coverage provided "will not be broader than that which [Good Shepherd is] required by contract or agreement to provide for such additional insured."  Ex. 2 at 330.

### 7.      The Scheduled AI Endorsement

The third relevant "additional insured" endorsement, titled "Additional Insured – Owners, Lessees or Contractors – Scheduled Person or Organization," modifies the CGL Coverage Part and names "The City of New York including its officials and employees" as an "additional insured . . . with respect to liability for 'bodily injury,' 'property damage' or 'personal and advertising injury.'"  56.1 Stmt. ¶ 56; Ex. 2 at 261 (hereinafter, the "Scheduled AI Endorsement").  The Scheduled AI Endorsement provides that the coverage afforded to the City "will not be broader than that which [Good Shepherd is] required by the contract or agreement to provide for such additional insured."  Ex. 2 at 261.

### B.      The Good Shepherd Policy Covers the City

The parties agree that the City's contract with Good Shepherd required Good Shepherd to obtain an insurance policy that covered the City as an additional insured, and that Good Shepherd's coverage was to be as broad as the then-latest ISO Form CG 00 01.  *See* 56.1 Stmt. ¶ 38.  The parties also agree that the City is an Additional Insured under the CGL Coverage Part, *see* Def. Mem. at 10, and that PIIC is defending Good Shepherd in *S.M.*, 56.1 Stmt. ¶ 62.  The parties disagree, however, as to which provision of the Good Shepherd Policy is implicated by the *S.M.* Action.  PIIC argues that *S.M.* falls within the Human Service Organization Professional Policy ("HSOP"), which PIIC claims is a standalone coverage part purchased by Good Shepherd that does not include the City as an additional insured.  Def. Mem. at 10–12.  Alternatively, PIIC argues that the *S.M.* Action falls within SPAM coverage, which PIIC again argues is a standalone policy without additional insured coverage.  *See id.* at 15–16.  By contrast, the City argues that

*S.M.* falls within the CGL Coverage Part, which includes the City as an Additional Insured.  *See*
Pl. Mem. at 33–34.

For the reasons discussed below, the Court finds that *S.M.* falls within the CGL Coverage
Part, and because no exclusion squarely applies, PIIC is contractually obligated to defend the
City.

### 1.    "HSOP" Coverage

As described above, the standard CGL Coverage Form includes "Coverage A – Bodily
Injury and Property Damage Liability" and "Coverage B – Personal and Advertising Injury
Liability."  *See* Proshansky Decl., Ex. A.  "Personal and advertising injury" is defined as "injury,
including consequential 'bodily injury,' arising out of . . . [f]alse arrest, detention or
imprisonment."  *See id.* at 15.  The gravamen of S.M.'s complaint is that Good Shepherd
wrongfully placed S.M. in a facility with strict lockdown conditions that isolated her from
friends and family and prevented her from leaving the building to attend school.  *See generally*
Ex. G, Dkt. 30-6.  S.M. alleges that S.M. was subjected to "false arrest, detention, or
imprisonment" resulting in "bodily injury."  *See, e.g.*, *id.* ¶¶ 69–76.  That places her claim
squarely within the CGL Coverage Part's Coverage B – Personal or Advertising Injury Liability.

PIIC argues that "each of [S.M.'s] allegations implicate the professional services
provided by Good Shepherd and/or the City[] in providing custodial services to S.M."  Def.
Mem. at 10.  PIIC goes on to argue that it provided professional services liability coverage "in
the form of a Human Service Organization Professional Policy [HSOP]" that "only extended
additional insured coverage to the City if the contract [between the City and Good Shepherd]
required that the City be added as an additional insured for professional liability claims."  *Id.* at
10–11.  Because the City's contract with Good Shepherd only required the City to be named as

an additional insured on its CGL Coverage, PIIC argues, the City is not an additional insured under the professional services liability coverage.  *See id.*

PIIC's argument is fundamentally flawed.  First, not once does PIIC point to the section of the Good Shepherd Policy that provides a "Human Service Organization Professional Policy" that purportedly covers Good Shepherd vis-à-vis the *S.M.* Action, nor could the Court independently locate such coverage in the policy PIIC provided.  Second, the policy language that PIIC quotes in its brief as narrowing additional insured coverage under the so-called HSOP Policy comes from the SPAM AI Endorsement.  *See* Def. Mem. at 11 ("We would note that the HSOP policy contained a scheduled additional insured endorsement but only if 'coverage provided to the additional insured is required by a contract or agreement.'").  The actual HSOP Endorsement that PIIC argues applies is far broader — it provides Additional Insured coverage to a government organization where a written contract requires "that such person or organization be added as an additional insured . . . with respect to liability arising out of [Good Shepherd's] ongoing operations performed for that additional insured."  *See* Ex. 2 at 440.  In other words, the HSOP Endorsement does not limit Additional Insured coverage to the scope of coverage required by the contract with Good Shepherd; rather, it broadly affords coverage if the Good Shepherd Contract requires that the City be added as an Additional Insured on the policy.  The additional insured coverage is limited only to claims arising out of Good Shepherd's "ongoing operations" performed under its contract with the Additional Insured.  *See id.*

Accordingly, even if the *S.M.* Action fell within HSOP Coverage, and assuming PIIC's position that HSOP coverage is separate from CGL Coverage, the HSOP Endorsement expressly extends HSOP coverage to the City as an Additional Insured.  PIIC cannot disclaim its duty to defend the City on the grounds that it is not an additional insured under HSOP.

2.    **SPAM Coverage**

PIIC also argues that its defense of Good Shepherd in *S.M.* is based on Good Shepherd's SPAM Vicarious Liability coverage, which, it claims, is separate from the CGL Coverage Part. *See* Def. Mem. at 15.  PIIC does not explain how the *S.M.* complaint, which alleges damages from severely restrictive housing conditions, implicates "Sexual Abuse and Molestation" coverage; nowhere in the Complaint does S.M. allege sexual abuse or molestation.  The City, however, appears to concede that the *S.M.* Action could fall under the SPAM coverage.  *See* Pl. Mem. at 38–39.

As an initial matter, and as with the YMCA Policy, the Court is persuaded that Good Shepherd's SPAM coverage falls within the CGL Coverage Part.  First, the CGL Form Schedule specifically lists the SPAM AI Endorsement.  *See* Ex. 2 at 61 (listing "PI-SO-015 – Additional Insured," which is the corresponding document label reflected on the SPAM AI Endorsement); *see also* Pl. Mem. at 33.  The SPAM AI Endorsement modifies the insurance provided under the SPAM "Vicarious Liability Coverage Form."  *See id.*  If there were a separate SPAM Coverage Part, the SPAM AI Endorsement would not have been listed on the CGL Form Schedule but, rather, on a SPAM Form Schedule — a form schedule that does not exist in the Good Shepherd Policy.  *See* Pl. Mem. at 34; *see also* Pl. Reply at 11.  Because each Coverage Part has a corresponding Form Schedule listing the forms and endorsements applicable to that Coverage Part, the absence of a SPAM Form Schedule is persuasive evidence that there is no separate SPAM Coverage Part.  *See* Pl. Mem. at 35.

PIIC contends that, even if SPAM coverage falls within the CGL Coverage Part, it "is provided ONLY for the named insured," and that, even if the City's contract with Good Shepherd explicitly required SPAM coverage, "it would not be provided because [the SPAM] endorsement does not provide additional insured coverage to anyone."  Def. Mem. at 15–16.

The basis for PIIC's position is a mystery; the SPAM AI Endorsement expressly extends coverage to additional insureds.  It amends "who is an insured" under the Policy to include as an Additional Insured any governmental organization when required by a written contract.  56.1 Stmt. ¶ 54; Ex. 2 at 330.  PIIC entirely ignores the SPAM AI Endorsement, along with the other Additional Insured endorsements that provide the City with Additional Insured coverage under the CGL Coverage Part.  *See, e.g.*, Ex. 2 at 261, 320.  The City, a government organization that required CGL coverage in a written contract with Good Shepherd, is without question an additional insured for purposes of SPAM coverage.  Thus, even if S.M.'s claim implicated SPAM coverage, the City would be entitled to coverage by virtue of the SPAM AI Endorsement within the CGL Coverage Part.

Moreover, contrary to PIIC's contention, it was not necessary for the City to "ask[] for sexual molestation coverage."  Def. Mem. at 18.  Coverage provided by the standard CS 00 01 form, which the City mandated as the minimum coverage Good Shepherd must procure, encompasses bodily injury claims.  *See* Pl. Reply at 17–18; Proshansky Decl., Ex. A.  There can be no dispute, then, that the "scope of coverage under" the ISO Form in the CGL Coverage "necessarily includes coverage for 'bodily injury' caused by sexual abuse or molestation; otherwise there would be no need for the Abuse Exclusion."  Pl. Mem. at 38.

Accordingly, even if *S.M.* triggered SPAM coverage, the City nonetheless would be afforded coverage as an additional insured.

### 3.    No Exclusion Applies

Because the City has met its burden to demonstrate that it is an additional insured under the CGL Coverage Part, the burden shifts to PIIC to demonstrate that "the claims in the complaint fall 'solely and entirely within the policy exclusions, and, further, that the allegations, *in toto*, are subject to no other interpretation.'"  *Napoli, Kaiser & Bern, LLP v. Westport Ins.*

31

*Corp.*, 295 F. Supp. 2d 335, 338 (S.D.N.Y. 2003) (cleaned up).  Courts generally consider exclusionary clauses contrary to the protective purpose of insurance; accordingly, they are construed narrowly against the insurer.  *Belt Painting Corp. v. TIG Ins. Co.*, 100 N.Y.2d 377, 383 (2003) ("[P]olicy exclusions are given a strict and narrow construction, with any ambiguity resolved against the insurer.").

The *S.M.* complaint alleges that S.M. was wrongfully housed in a lockdown facility that restricted her from leaving the building to attend school and significantly curtailed her ability to contact friends and family.  *See generally* Ex. G.  PIIC does not dispute the City's argument that *S.M.* falls within Coverage B of the CGL Coverage Part, which expressly covers false imprisonment claims.  Instead, PIIC argues that the City must "take the CGL coverage along with its exclusions," including the Abuse Exclusion and the Professional Services Exclusion, both of which apply to bodily injury and personal and advertising injury claims.  Def. Mem. at 11–15; *see also* Def. Reply at 6.  PIIC, however, fails to demonstrate that either exclusion applies.

The Abuse Exclusion, as described *supra*, broadly excludes coverage for claims of "abuse or molestation."  *See supra* Section IV(B)(3); 56.1 Stmt. ¶ 53.  But S.M. does not allege sexual abuse or molestation of any kind.  Although there are scattered allegations of physical abuse, *see, e.g.*, Ex. G ¶ 57 (alleging that, while in lockdown, other residents "physically attacked [S.M.] or damaged her belongings"), those allegations are clearly a consequence of S.M.'s confinement in a lockdown facility; the cause of action more closely resembles one for false imprisonment than physical or sexual abuse or molestation, *see id.* ¶ 1 ("Foster care is not meant to resemble prison.").  Because the gestalt of the complaint hues more closely to a false imprisonment claim, and false imprisonment falls expressly within Coverage B of CGL

Coverage, PIIC cannot rely on the Abuse Exclusion to avoid its duty to defend the City.  *See*

*Cowan v. Codelia, P.C.*, 1999 WL 1029729, at *4 (S.D.N.Y. Nov. 10, 1999) ("If the insurer has

a duty to defend any part of an action, then the insurer has a duty to defend the entire action."

(citing *Frontier*, 91 N.Y.2d at 175)).[28]

 Nor does the Professional Services Exclusion apply.  The Professional Services

Exclusion is tailored largely to healthcare providers — it encompasses liability arising out of

"[m]edical, surgical, dental, x-ray or nursing service, treatment, advice or instruction," or related

services; "health or therapeutic service, treatment, advice or instruction;" and services such as

"skin enhancement, hair removal, or replacement or personal grooming."  *See* Ex. 2 at 319.  The

*only* plausible application to a foster care setting like Good Shepherd is the very last exclusion

that covers "professional incidents," which is defined to include acts or omissions related to the

"rendering of professional services to others, including counseling services."  *See id.*  The

imprisonment of a foster-care child is most certainly not the "rendering of professional services"

or "counseling services" contemplated by the Professional Services Exclusion.  *See id.*[29]

 In an attempt to clarify its position on the Professional Liability Exclusion, PIIC asserts

that it "do[es] not suggest . . . that all of the allegations [in S.M.'s complaint] fall within the

professional liability exclusion.  Some do, certainly, as these City agencies were providing

professional services."  Def. Reply at 6.  Even if that were true, PIIC ignores the long-standing

"entire action" rule: "the insurer is required to defend the entire action," even if some claims in

the underlying litigation "are arguably or potentially non-covered claims."  *See Fieldston*, 16

---

[28] Even if the Abuse Exclusion captured S.M.'s claims of physical abuse, the duty to defend is broad: "the insurer is required to defend the entire action," even if some claims in the underlying litigation are arguably or potentially claims that are not covered.  *See Fieldston*, 16 N.Y.3d at 264–65 (citing *Massena*, 98 N.Y.2d at 443).

[29] Indeed, it is so clear that this exclusion has nothing to do with foster care services that the City refused to waste any ink on the argument.  *See* Pl. Mem. at 32 n.11 ("Professional Liability coverage is ultimately not relevant . . . and is not further addressed.").

N.Y.3d at 264–65.  Thus, even if PIIC could demonstrate that the Professional Services Exclusion *might* apply to preclude coverage, that would still be insufficient: PIIC must show that S.M.'s "allegations, *in toto*, are subject to no other interpretation.'"  *Napoli*, 295 F. Supp. 2d at 338.  Because PIIC cannot meet its burden, and there is a "reasonable possibility of recovery" under the Policy, *Fieldston*, 16 N.Y.3d at 264, PIIC is obligated to defend the City against the *S.M.* Action.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for summary judgment is GRANTED. Defendant's motion for summary judgment is DENIED.  This case is DISMISSED.

The Clerk of Court is respectfully directed to terminate all open motions and to CLOSE the case.

**SO ORDERED.**

Date:  **July 10, 2023**
       **New York, New York**                                      **VALERIE CAPRONI**
                                                                   **United States District Judge**